IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

GIFTANGO, LLC, a Delaware
limited liability company,

               Plaintiff,                     No. 03:13-cv-31-AC

     v.

KENT M. ROSENBERG, an individual;
TODD A. HAIMERL, an individual;        OPINION & ORDER
BLACKHAWK NETWORK
CALIFORNIA, INC., a California
corporation, and BLACKHAWK
NETWORK, INC., an Arizona corporation,

           Defendants.

Robert L. Allen
George J. Cooper
Allyson S. Krueger
DUNN CARNEY ALLEN HIGGINS & TONGUE LLP
851 S.W. Sixth Avenue, Suite 1500
Portland, Oregon 97204-1357

     Attorneys for Plaintiff

1 - OPINION & ORDER

Amy Joseph Pedersen
Jamie S. Kilberg
STOEL RIVES LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon 97204

  Attorneys for Defendants Rosenberg and Haimerl

David P.R. Symes
James M. Barrett
Sean M. Driscoll
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
222 S.W. Columbia Street, Suite 1500
Portland, Oregon 97201

  Attorneys for Defendant Blackhawk California

HERNANDEZ, District Judge:

  Plaintiff Giftango, LLC brings this action against defendants Kent Rosenberg, Todd Haimerl, Blackhawk Network California, Inc., and Blackhawk Network, Inc., contending that Rosenberg and Haimerl, who worked for plaintiff until early January 2013, violated Oregon's Uniform Trade Secrets Act and breached Confidentiality Agreements they signed with plaintiff by providing confidential information to Blackhawk[1]. Plaintiff also brings claims against Blackhawk for intentionally interfering with the individual defendants' contracts, for intentionally interfering with plaintiff's relationships with plaintiff's customers, and for violating Oregon's Uniform Trade Secrets Act.

  Plaintiff moves for a preliminary injunction enjoining the individual defendants from

---

[1] In the original Complaint, plaintiff named the corporation as "Blackhawk Network California, Inc., dba Blackhawk Network, Inc." In response to an argument made by defendant that plaintiff named the wrong entity, plaintiff filed a First Amended Complaint adding Blackhawk Network, Inc. as a separate defendant. I refer to the corporations together as the singular "Blackhawk."

2 - OPINION & ORDER

engaging in conduct which violates certain provisions of their employment agreements with plaintiff, and enjoining Blackhawk from disclosing information or trade secrets of a "Giftango Entity" or using such information or trade secrets to solicit business from other persons or entities.  I deny the motion.

BACKGROUND

I.  Procedural Posture

Plaintiff filed this action in Multnomah County Circuit Court on January 8, 2013.  The day before, plaintiff's counsel had notified defendants that plaintiff intended to appear at *ex parte* in Multnomah County Circuit Court at 1:30 p.m. on January 8, 2013, to seek a temporary restraining order (TRO).  Defendants' counsel appeared at *ex parte* and received a copy of the Complaint and TRO motion at that time.  Because defendants had not been given twenty-four hours' notice of plaintiff's intent to appear at *ex parte* as required by the circuit court's local rules, the court granted defendants' request to defer the hearing until the next day.

However, before that rescheduled TRO hearing occurred, defendants removed the case to this Court on January 9, 2013.  The next day, January 10, 2013, plaintiff moved for a TRO and preliminary injunction in this Court.  I granted the TRO motion on January 10, 2013.  In the TRO, I set an accelerated briefing schedule for the motion for preliminary injunction and set a hearing on the preliminary injunction motion for January 23, 2013.  On January 14, 2013, I signed an Amended TRO identical to the first TRO except that it attached the Confidentiality Agreements at issue as exhibits.

II.  Overview of Facts

Plaintiff is in the electronic gift card industry.  It is a "Portland-based digital gift card

3 - OPINION & ORDER

solutions provider that powers gift card delivery from merchant websites and through distribution agreements with loyalty, incentive, financial payment, promotional and reseller programs." First Am. Compl. at ¶ 9. Blackhawk competes with plaintiff. Id. at ¶ 12.

Plaintiff employed Rosenberg from on or about December 29, 2009 as its Executive Vice-President of Sales and then as its Executive Vice-President of Strategy until his resignation on January 3, 2013. Id. at ¶ 10; Rosenberg Decl. at ¶ 17. Plaintiff employed Haimerl as the Director of Channel Development from on or about April 1, 2010 until his resignation on January 4, 2013. First Am. Compl. at ¶ 11; Haimerl Decl. at ¶¶ 14, 15, 28.

Rosenberg and Haimerl both signed "Confidentiality and Proprietary Rights Agreements" (the "Confidentiality Agreements") with plaintiff at the inception of their employment with plaintiff. First Am. Compl. at ¶ 13; Exs. 1, 2 to First Am. Compl. These are discussed in more detail below.

On December 31, 2012, as a result of a merger, Giftango Corporation became a wholly owned subsidiary of InComm Holdings, Inc. First Am. Compl. at ¶ 8. On January 3, 2013, Giftango Corporation converted from an Oregon corporation to a Delaware limited liability company, and became Giftango, LLC, a Delaware limited liability company and Giftango Corporation's successor. Id.

Shortly before the InComm merger, and explained in more detail below, Rosenberg contacted Talbott Roche, Blackhawk's President, about a job with Blackhawk. Ex. 3 to First Am. Compl.; Rosenberg Decl. at ¶ 25. Haimerl also spoke with Roche, on or about December 31, 2012. Haimerl Decl. at ¶ 24. As indicated above, Rosenberg and Haimerl left employment with plaintiff shortly thereafter. Plaintiff alleges that both individuals began working for Blackhawk

4 - OPINION & ORDER

on January 7, 2013, under six-month consulting contracts.  First Am. Compl. at ¶ 35.  Based on

emails sent by Rosenberg to Blackhawk in late December 2012 and early January 2013, plaintiff

alleges that Rosenberg and Haimerl have breached their Confidentiality Agreements by

misappropriating plaintiff's confidential information and using that information to unfairly

compete with plaintiff.  First Am. Compl. at ¶¶ 38-40.

III.  The Confidentiality Agreements

The portions of the Confidentiality Agreements relevant to this dispute are the section

defining "Confidential Information," the non-solicitation provision, and the non-competition

provision.

In Rosenberg's Confidentiality Agreement, "Confidential Information" is defined to

mean:

> data that has been researched, compiled, developed and/or maintained by
> Company [previously defined as Giftango, Inc.], and which is not generally
> known within the industry.  Confidential Information includes, but is not limited
> to, trade secrets, information, ideas, knowledge, data, or know-how related to
> products, processes, software, designs, formulae, tests, research, business and/or
> marketing plans and strategies, costs, profits, pricing, personnel and financial
> information, capitalization and other corporate data and information, and
> information about or obtained from customers, authors, suppliers, consultants,
> licensees, or affiliates.  Confidential Information also includes information
> Company has received from third parties in confidence.
>
> (a)  **Use and Disclosure Restrictions**.  I will not use or disclose
> Confidential Information, in any form, for any purpose, except in the course of
> and for the purposes of my employment or consulting relationship with Company.
>
> (b) **Ownership of Information**.  I will obtain no right, title or interest in
> the Confidential Information, or any related information or data.  The Confidential
> Information and related information shall remain the sole property of Company.
>
> (c) **Return of Information**.  I will return all Confidential Information,
> including all copies in any form, to Company immediately upon termination of my

employment or consulting relationship with Company, or earlier upon request of Company.

Ex. 1 to First Am. Compl. at ¶ 1.

The non-solicitation provision states that

For one year after my employment or consulting relationship with Company terminates, regardless of the reason for termination, I will not (a) directly or indirectly solicit business from any person or entity which then is or was a Company customer, client or prospect during the twelve (12) months prior to termination, (b) induce any such person or entity to cease or reduce their business relationship with Company; (c) induce any person to leave the employment of Company; or (d) directly or indirectly hire or use the services of any Company employee unless I obtain Company's written consent.  I will not aid others in doing anything I am prohibited from doing myself under this paragraph, whether as an employee, officer, director, shareholder, partner, consultant or otherwise. For purposes of this paragraph, the term "solicit" includes (i) responding to requests for proposals and invitations for bids, (ii) initiating contacts with customers, clients, or prospects of Company for the purpose of advising them that I no longer am employed by or consulting for Company and am available for work which is competitive with the services offered by Company, and (iii) participating in joint ventures or acting as a consultant or subcontractor or employee of others who directly solicit business prohibited by this Agreement.  The term "Company employee" includes any then current employee of Company or any person who has left the employ of Company within the then previous six (6) months.  The terms "Company client" and "Company customer" include any parent corporation, subsidiary corporation, affiliate corporation or partner or joint venture of a client or customer.  "Company prospect" means any person or entity to whom Company has submitted a bid or proposal within the then immediately preceding six (6) months.  The provisions outlined in this section of the Agreement will not apply to a Company client, Company customer, Company prospect, that Employee had an existing relationship with prior to employment with Company.  Existing relationship will mean either Employee negotiated an agreement to the entity prior to being employed by Company.

Id. at ¶ 7.

The non-competition provision states:

For twelve months following termination of my employment for any reason, I will not directly or indirectly Compete (defined below) with Company anywhere Company is doing or planning to do business, nor will I engage in any other

activity which would conflict with the Company's business, or interfere with my obligations to the Company.  "Compete" means directly or indirectly:  (i) have any financial interest in, (ii) join, operate, control or participate in, or be connected as an officer, employee, agent, independent contractor, partner, principal or shareholder with (except as holder of not more than five percent (5%) of the outstanding stock of any class of a corporation, the stock of which is actively publicly traded) or (iii) provide services in any capacity to those participating in the ownership, management, operation or control of, and/or (iv) act as a consultant or subcontractor to, a Competitive Business (defined below). "Competitive Business" means CashStar, MocaPay, Transaction Wireless, Arrow Eye, BoomTime, Giiv, GiftCertificates.com and any of their affiliates.

Id. at ¶ 8.

Haimerl's Confidentiality Agreement is identical with two exceptions.  Ex. 2 to First Am. Compl.  In the non-solicitation provision, Haimerl's Confidentiality Agreement omits the last two sentences[2] and in the non-competition provision, an additional company called "TheGiftCardCafe.com," is included in the list defining "Competitive Business."  Id. at ¶¶ 7, 8.

IV.  Events Leading to the Individual Defendants' Resignations

A.  Rosenberg

Rosenberg states that on December 21, 2012, while on his personal time, using his personal phone, he "reached out" to Roche to inquire about a job.  Rosenberg Decl. at ¶ 25.  He was unhappy with his compensation with plaintiff and before the finalization of the deal between plaintiff and InComm, he was entertaining more lucrative employment opportunities.  Id. at ¶ 23. In anticipation of the deal with InComm, plaintiff's President David Nelsen presented Rosenberg with a new agreement with new confidentiality, non-competition, and non-solicitation clauses.

---

[2]  Those two sentences state that the "provisions outlined in this section of the Agreement will not apply to a Company client, Company customer, Company prospect, that Employee had an existing relationship with prior to employment with Company.  Existing relationship will mean either Employee negotiated an agreement to the entity prior to being employed by Company."  Ex. 1 to First Am. Compl. at ¶ 7.

Id. at ¶ 24.  Rosenberg decided not to execute it because he was considering other job offers.  Id.

Rosenberg emailed Roche on December 21, 2012 from his personal email account using his personal computer.  Id. at ¶ 25.  He wrote:

> Hi Talbott,
>
> Have you got some time available to get caught up today?  I need to have a highly confidential meeting with you about an event that is happening on 12/31/12 that has me considering several new employment opportunities.
>
> I think you know my track record well, but I thought that I would remind you that I was the key recruit 3 years ago that made Giftango what it is today.  Giftango had zero distribution and no national merchant relationships when I was recruited to round out the senior management team.  I am the key member of the Giftango leadership team that built out our distribution model, acquired almost 100% of our merchant relationships, many of our distribution channels, and attracted the talent that we recruited at the VP and Director level.
>
> I know Giftango's relationships, strengths and weaknesses probably better than David Nelsen.
>
> I have 2 other employment opportunities that I am considering, but Blackhawk clearly makes the list of logical moves for me.
>
> Interested? If so, we are going to have to move fast.  I appreciate your discretion in not sharing this communication with anyone outside of Blackhawk.

Ex. 4 to Fletcher Decl. at 6.  Rosenberg states that time was of the essence because if the deal with InComm closed, he was going to have to sign the new confidentiality agreement with the new provisions.  Rosenberg Decl. at ¶ 25.

For the next several days, Rosenberg and Roche exchanged emails about when they could converse.   Ex. 4 to Fletcher Decl. at 4-6.  According to Rosenberg, at midday on December 28, 2012, Nelsen told him that he was not going to get a raise after the merger with InComm, and would receive only 1.67% of the equity that was being divided among ten Giftango employees.

8 - OPINION & ORDER

Id. at ¶ 26.  Rosenberg also learned from another employee that although Nelsen had received

approval for a $50,000 raise for Rosenberg, Nelsen decided to spread that money among other

employees.  Id. at ¶ 27.

Rosenberg and Roche finally spoke in the late afternoon on December 28, 2012.  Id. at ¶

28.  Rosenberg states that Roche asked him if Giftango was being acquired by InComm.  Id.

Rosenberg told Roche that he could not confirm or deny the rumor, but if it were the case, he had

no interest in working for InComm.  Id.  He did not disclose to Roche that InComm and plaintiff

were discussing an acquisition.  Id.

Roche and Rosenberg discussed where Rosenberg fit into plaintiff's organization.

Rosenberg told her about Haimerl, whom Roche said she did not know.  Id.  Later that day,

Rosenberg forwarded a copy of his own resume to Roche, telling her that she might want to

forward it to "Tomas prior to our call."  Ex. 4 to Fletcher Decl. at 4.

On December 29, 2012, Rosenberg called Haimerl and told him that Rosenberg was

interviewing at Blackhawk and that Roche had asked for his phone number.  Rosenberg Decl. at

¶ 30.  Rosenberg sent Haimerl's contact information to Roche.  Id.  Haimerl told Rosenberg that

he had just received a request to connect from Roche via LinkedIn.  Id.

Also on December 29, 2012, Roche emailed Rosenberg with a list of questions, seeking

his thoughts.  Ex. 4 to Fletcher Decl. at 3-4.  And, also on that date, Rosenberg had a telephone

interview with Tomas Campos, a manager at Blackhawk.  Rosenberg Decl. at ¶ 31.  Rosenberg

states that he did not reveal any of plaintiff's confidential, proprietary, or trade secret information

to Campos.  Id.  Campos states that during the interview, Rosenberg told him that he wanted to

leave plaintiff because he did not want to work for InComm and if he stayed with plaintiff, he

9 - OPINION & ORDER

would be required to sign an agreement that would restrict him from working for Blackhawk and other companies for a long time.  Campos Decl. at ¶ 7.

Rosenberg responded to Roche's questions the night of December 29, 2012.  Ex. 4 to Fletcher Decl. at 2-3.  In the email responding to the questions, Rosenberg told Roche that he had just received an email from Nelsen telling Rosenberg and senior management that Roche was now aware of "the pending deal[.]"  Id.

Rosenberg wrote paragraphs of information in response to Roche's questions.  Id.  In response to the question of "[w]hat distribution deals could you bring to [Blackhawk]?", Rosenberg stated:

> [I]f I was able to extend better margins and/or better terms and a similar delivery mechanism...it is my opinion that many of Giftango's distribution portfolio would be ripe for the picking.  Also consider that Giftango/InComm will have considerable distractions in consummating their marriage and if Giftango was to lose Todd [Haimerl] and me...they would have a difficult time filling that void. Todd and I own the lion's share of Giftango's business relationships and while Giftango/InComm are distracted...I know we could quickly cherry pick their distribution portfolio.  Other benefits include our intimate understanding of what is important to each distribution channel, i.e. product selection, margin, terms, technology, etc.

Id. at 3 (ellipses in original).

In response to the question of how Rosenberg would "compete against an Incomm and G-tango combo" and "[o]thers in the marketplace," Rosenberg replied that he

> would focus on digital aggregation in loyalty/incentive and not get distracted with powering delivery from the merchant's websites.  This continues to be a key distraction for Giftango, CashStar and TW and this side of the business is very labor intensive and full of fraud.  Loyalty/incentive doesn't have the headache involved with credit card transactions.
>
> Join the Blackhawk team... I am the glue that keeps Giftango going... it will be a huge blow to the organization.  Todd [Haimerl] would be a one two punch, but

you are going to need to move quickly.

Id.

In his Declaration, Rosenberg states that in making these statements, he was not revealing any confidential business plan information of plaintiff's but rather, was reporting on readily available information about Giftango's, CashStar's, and Transaction Wireless's customer base and suggesting that a different focus was better.  Rosenberg Decl. at ¶ 33.  He also explains that once he knew that Blackhawk was talking to Haimerl, he expressed his belief that both he and Haimerl would make excellent additions to Blackhawk.  Id.

On December 30, 2012, Roche emailed Rosenberg to confirm their agreement that Rosenberg would start a six-month consulting agreement with Blackhawk on January 7, 2013. Ex. 4 to Fletcher Decl. at 2.  She wrote that he would report to Tim Attinger with a focus on "new business development in digital giftcard marketplace" with a "particular focus on signing new distribution partners in the incentive and rewards space and accelerating onboarding of card partners to our digital platform."  Id.  Compensation information was to be forwarded within the next day, and during the consultancy, they expected to explore the "fit" for a permanent position. Id.

On January 1, 2013, Roche emailed the compensation information to Rosenberg, under which he was to be paid an "annualized base" of $185,000, as well as a $10,000 "bonus for every new distribution partner signed."  Id. at 1.  Rosenberg accepted the offer and noted in his response email that he and Haimerl had already talked and started "strategizing[.]"  Id.

Rosenberg states in his Declaration that he has not disclosed any confidential or proprietary information or trade secrets to Blackhawk and has not solicited a Giftango customer

since leaving employment with plaintiff.  Rosenberg Decl. at ¶¶ 34, 35.  Blackhawk has not

asked him to solicit any of plaintiff's customers.  Id. at ¶ 35.  Further, he states that he has no

employment or consulting arrangement with Blackhawk.  Id. at ¶ 37.  Although he accepted the

employment offer on January 1, 2013, since that time Blackhawk has requested that he perform

no work for Blackhawk.  Id.  He has not signed a consulting or employment agreement with

Blackhawk.  Id.

B.  Haimerl

Haimerl states that in late 2012, he learned that InComm may purchase Giftango.

Haimerl Decl. at ¶ 17.  He was concerned about his compensation with the new company and

how his shares would be valued.  Id.  He was stunned to learn in late December that he would

receive only $90,000 for his equity stake in plaintiff.  Id. at ¶ 18.

On December 29, 2012, Haimerl received an invitation to connect with Roche via

LinkedIn.  Id. at ¶ 19.  Although he knew of Blackhawk, he had not previously interacted with

Roche.  Id.  He also heard from Rosenberg on that date, who told him that Roche wanted

Haimerl's contact information.  Id.

On Sunday, December 30, 2012, Roche left Haimerl a voice mail.  Id. at ¶ 21.  Later than

evening, he learned from another employee of plaintiff's that his salary after the merger with

InComm would increase to $85,000 from $70,000.  Id. at ¶ 22.  He was disappointed.  Id.

On December 31, 2012, Haimerl decided to resign from plaintiff.  Id. at ¶ 23.  He had not

yet spoken to Roche.  Id.  He states that Rosenberg did not solicit him to resign or to take a

position with Blackhawk.  Id.  Later that day, he spoke to Roche.  Id. at ¶ 24.  She asked him his

plans about his employment with plaintiff.  Id.  He replied that he was not happy.  Id.  They

12 - OPINION & ORDER

discussed compensation at Blackhawk.  Id.

On January 1, 2013, Haimerl sent Roche his resume.  Id. at ¶ 25.  The next day, he told her what compensation he wanted, including $13,000 per month for eight months and a $10,000 bonus for each distribution agreement he brought in, under a contractor agreement.  Id.  Roche told him an independent contractor role would be possible and that to become a regular employee, he would likely have to go through the normal interview process.  Id.

On January 2, 2013, Haimerl learned that another management-level employee with plaintiff, Jennifer Philo, resigned.³  Id. at ¶ 26.  He also learned that Rosenberg resigned.  Id. at ¶ 27.

Haimerl resigned on January 4, 2013.  Id. at ¶ 28.  At the time he resigned, he had no offer of employment or any other relationship with Blackhawk.  Id.  Haimerl communicated with Roche on January 4, 2013 to tell her he had decided "not to go forward" with plaintiff.  Id. at ¶ 29.  She asked if he would be interested in visiting Blackhawk in California to explore options the week of January 7, 2013.  Id.  He did not have a job offer from Blackhawk.  Id.

Haimerl has not solicited a Giftango customer since leaving Giftango.  Id. at ¶ 31.  Blackhawk has not asked him to solicit any of plaintiff's customers.  Id.  He has not disclosed any of plaintiff's confidential, proprietary, or trade secret information to Blackhawk.  Id.

Blackhawk has requested that he perform no work for Blackhawk.  Id. at ¶ 33.  He has never signed any consulting or employment agreement with Blackhawk.  Id.

---

³ Philo and plaintiff are in litigation over her departure and subsequent hiring by Blackhawk.  Plaintiff's case against Philo was filed in this Court on January 13, 2013, and assigned civil case number 03:13-cv-00057-AC.  Plaintiff represents that Philo has filed a separate action for declaratory relief in the Southern District of California.

STANDARDS

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  The plaintiff "must establish that irreparable harm is likely, not just possible[.]"  Alliance For The Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).  The court may apply a sliding scale test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."  Id.  Thus, a  party seeking an injunction may show greater irreparable harm as the probability of success on the merits decreases.  Id. (noting also that the relevant test in the Ninth Circuit is described as the "serious questions" test where the likelihood of success is such that "serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor") (internal quotation marks and brackets omitted).

The party requesting a preliminary injunction must carry its burden of persuasion by a "'clear showing'" of the four required elements set forth above.  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam); Lopez v. Brewer, 680 F.3d 1068, 1072 (9th Cir. 2012) (a "'preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion'") (quoting Mazurek, 520 U.S. at 972).

/ / /

/ / /

14 - OPINION & ORDER

DISCUSSION

I.  The Claims in the Amended Complaint

Plaintiff brings the following claims:  (1) breach of contract against the individual defendants, alleging that they breached the Confidentiality Agreements in five separate ways; (2) violation of Oregon's Uniform Trade Secrets Act, Oregon Revised Statutes §§ (O.R.S.) 646.461-646.475, brought against all defendants; (3) breach of fiduciary duty and breach of the duty of loyalty against the individual defendants; (4) tortious interference with economic relations (as to plaintiff's relations with its customers), brought against all defendants; (5) tortious interference with economic relations (as to plaintiff's contracts with the individual defendants), brought against Blackhawk; (6) civil conspiracy brought against all defendants; (7) equitable accounting as to all defendants; (8) constructive trust as to all defendants; and (9) injunctive relief as to all defendants.  First Am. Compl. at ¶¶ 43-113.

II.  Likelihood of Success on the Merits

Defendants argue that plaintiff cannot establish that it is likely to succeed on the merits of its claims.  The individual defendants specifically attack plaintiff's ability to succeed on the breach of contract and trade secrets claims.  They note that because plaintiff cannot succeed on those claims, it necessarily means plaintiff cannot succeed against the individual defendants on the breach of fiduciary duty and intentional interference with economic relations claims. Blackhawk argues that plaintiff cannot show that it is likely to succeed on the trade secrets claim as to Blackhawk, or as to either of the intentional interference claims against Blackhawk.

A.  Breach of Contract Claims

The individual defendants argue that the non-solicitation provision is effectively a non-

competition provision which is unenforceable because it violates Oregon statutory requirements

for non-competition provisions.  Alternatively, they argue that the non-solicitation provision is an

unreasonable restraint of trade.  As to the confidentiality provision, they contend that plaintiff

cannot establish that there has been a disclosure and that any of the information is confidential.

I need not address the validity of the non-solicitation provision or whether the

information is confidential because on the record developed after the entry of the TRO and the

Amended TRO, plaintiff fails to establish the likelihood that a breach of contract has occurred.

Although Blackhawk's counsel argued otherwise, Rosenberg's email exchange with

Roche exposed his intent to share what appears to be confidential information with Blackhawk

once he began working for Blackhawk on January 7, 2013.  Rosenberg clearly had a plan.  The

emails are alarming and reasonably caused plaintiff to fear the imminent violation of the

confidentiality and non-solicitation provisions of the Confidentiality Agreement by Rosenberg

and possibly Haimerl.

However, in response to plaintiff's swift action in initiating litigation and seeking

temporary injunctive relief, Blackhawk and the individual defendants retreated from

commencing their relationships.  The individual defendants and Blackhawk all affirmatively

represent that no confidential information has been solicited or shared and that presently, neither

of the individual defendants is working for Blackhawk either as an employee or as a consultant.

While it may be that absent the TRO, actual violations of the Confidentiality Agreements would

have occurred, the record establishes that they have not.  Without a violation and without a

present relationship between the individual defendants and Blackhawk, there is not a "clear

showing" that the individual defendants either have breached or will breach the confidentiality or

non-solicitation provisions of the Confidentiality Agreements.

    B.  Trade Secrets Claims

    As to the trade secrets claims, I do not address the arguments that none of the information

at issue is a trade secret and that plaintiff took inadequate measures to protect the information.

As with the breach of contract claims, plaintiff does not show a likelihood of success on the

merits of the trade secrets claims because there is insufficient evidence in the record that

defendants misappropriated a trade secret.

    Oregon's trade secrets statute allows enjoinment of threatened as well as actual

misappropriation.  O.R.S. 646.463.  At the time the TRO motion was filed, Rosenberg's emails

established the threat of misappropriation.  Now, however, given that there is no evidence that a

misappropriation has actually occurred, and given that there is no active relationship between the

individual defendants and Blackhawk, the threat of misappropriation has substantially

diminished.  Thus, plaintiff does not show a likelihood of success on the trade secrets claims.

    C.  Intentional Interference Claims

    At this juncture, the evidence in the record indicates that neither Rosenberg nor Haimerl

told Blackhawk of any employment contracts they had with plaintiff and that no one at

Blackhawk was aware of any contracts that would affect the individual defendants' ability to

work for Blackhawk.  Roche Decl. at ¶ 9; Campos Decl. at ¶ 7.

    Nelsen states that on December 31, 2012, Philo told him that Blackhawk's Attinger had

been aggressively recruiting her and that she had told Attinger that she, and other employees of

plaintiff's, had non-competition agreements.  Nelsen Decl. at ¶ 14.  From this, plaintiff argues

that the evidence shows that Blackhawk knew about the Confidentiality Agreements and

17 - OPINION & ORDER

nonetheless acted to persuade the individual defendants to leave their employment with plaintiff and to violate the non-solicitation and confidentiality provisions of the Confidentiality Agreements.

The problem with this argument is that none of plaintiff's claims are based on an alleged breach of the non-competition provision in the Confidentiality Agreements. While Blackhawk may have known about non-competition agreements, that is not the same as knowing of a non-solicitation agreement or a confidentiality provision. Thus, plaintiff fails to make a clear showing, on the present record, of intentional acts by Blackhawk directed at interfering with plaintiff's contracts with Rosenberg and Haimerl.

Additionally, plaintiff fails to show a likelihood of success on the merits of its claim against Blackhawk alleging that Blackhawk intentionally interfered with plaintiff's relationships with plaintiff's customers. The record shows that Rosenberg reached out to Blackhawk, not the other way around, and that Rosenberg, not Blackhawk, brought Haimerl into the discussion regarding possible employment. And, as stated previously, there is no evidence that Blackhawk has in fact solicited any customers of plaintiff's or asked the individual defendants to do so.

Finally, because plaintiff fails to make a clear showing of a likelihood of success on its breach of contract and trade secrets act claims against the individual defendants, plaintiff cannot make the required showing on the intentional interference claim it brings against the individual defendants.

III. Irreparable Harm

Although plaintiff is not required to show actual harm at the preliminary injunction stage, plaintiff "must establish that irreparable harm is <u>likely</u>, not just possible." <u>Alliance for the Wild</u>

Rockies, 632 F.3d at 1131.  The likely harm must be supported by a "clear showing."  Mazurek,

520 U.S. at 972.  Speculative injury is insufficient.  Goldie's Bookstore, Inc. v. Superior Court,

739 F.2d 466, 472 (9th Cir. 1984).

Plaintiff fails to make the requisite showing of irreparable harm for two reasons.  First,

similar to the discussion above, plaintiff has established that before it initiated this litigation,

Rosenberg, and possibly Haimerl, were a threat.  However, the record now indicates that neither

of the individual defendants actually violated the Confidentiality Agreement provisions at issue

and that none of the defendants violated Oregon's trade secrets statute.  The record also indicates

that Blackhawk did not know of the specific provisions of the Confidentiality Agreements.  And,

the record shows that neither of the individual defendants are presently employed by Blackhawk

in any capacity.  Thus, plaintiff fails to show the likelihood that absent injunctive relief, it will

suffer substantial, irreparable harm.

Second, intangible injuries such as loss of goodwill and prospective customers can

qualify as irreparable harm.  Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., 240 F.3d

832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill

certainly supports a finding of the possibility of irreparable harm"); Rent–A–Center, Inc. v.

Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991) (damage to

reputation or customer relationships may support a finding of irreparable harm because it is

difficult to quantify).  But here, plaintiff provides no evidence that the claimed loss of customers

or goodwill is real and imminent, and not just speculative or potential.

Furthermore, the fact that the Confidentiality Agreements contain language that any

violation of the non-solicitation provision constitutes irreparable harm is not controlling.

19 - OPINION & ORDER

Inspection Mgmt. Sys., Inc. v. Open Door Inspections, Inc., No. 2:09–cv–00023–MCE–GGH, 2009 WL 805813, at*4-5 (E.D. Cal. Mar. 26, 2009) ("Plaintiff cannot rely on the contractual provisions of the EULA to show irreparable harm.  Instead, the court must make an independent determination of whether such harm is present") (citing, inter alia, Int'l Ass'n of Plumbing & Mech. Officials v. Int'l Conference of Bldg. Officials, No. 95-95544, 1996 WL 117447, at *2 n.3 (9th Cir. Mar. 15, 1996) (contractual provision is evidence of irreparable injury but it does not abrogate court's obligation to make finding of irreparable harm) (unpublished)).

Thus, going forward, and based only on the record to date, I find that while there is a possibility of harm absent preliminary injunctive relief, it is too speculative to be considered likely.  Compare Farmer Bros. Co. v. Albrecht, No. 2:11-CV-01371-PMP-CWH, 2011 WL 4736858, at *3 (D. Nev. Oct. 6, 2011) (finding alleged loss of customers not speculative when defendant employee had actually solicited plaintiff's customers and was currently servicing some of them).

IV.  Other Factors

A.  Balance of Equities

In considering whether to issue a preliminary injunction courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  Winter, 555 U.S. at 23 (internal quotation marks omitted); see also Univ. of Haw. Prof'l Assembly v. Cayetano, 183 F.3d 1096, 1108 (9th Cir. 1999) ("To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it").

Here, the possibility of harm in not issuing the injunction is, according to plaintiff, the

20 - OPINION & ORDER

loss of a significant share of its business by defendants' "cherry picking" plaintiff's distribution portfolio.  As I told plaintiff at oral argument, should plaintiff obtain information in discovery, or otherwise, that this has actually occurred, it can renew its request for injunctive relief at that time.  As long as that option is available to plaintiff, the likelihood of incurring losses that cannot be remedied through money damages is slim.

In contrast, the requested injunctive relief greatly hampers the individual defendants' ability to work for Blackhawk which is not prohibited by the non-competition provision in either Rosenberg's or Haimerl's Confidentiality Agreement.  The requested injunctive relief also restricts the individual defendants' ability to work in the electronic gift card industry.  Without evidence of violations of the non-solicitation or confidentiality provisions, or reason to believe that such violations are imminent, prohibiting the individual defendants from working for Blackhawk is unduly burdensome.  Plaintiff has not persuaded me that the balance of equities is in its favor.

B.  Public Interest

The public has an interest in enforcement of valid contracts to which the parties have voluntarily agreed.  That being said, without sufficient evidence of actual violations of the Confidentiality Agreements or the likelihood of irreparable harm, the injunctive relief requested by plaintiff is not in the public interest.

V.  Summary

On the present record, plaintiff does not show that it has a likelihood of success on the merits of its claims nor that it is likely to suffer substantial, irreparable harm.  Because plaintiff does not make a strong showing as to either of those elements, even applying the Ninth Circuit's

alterative "sliding scale" formula, plaintiff does not establish an entitlement to injunctive relief. Further, plaintiff has not carried its burden of persuasion regarding the balance of equities or shown that the public interest weighs in favor of injunctive relief.

CONCLUSION

Plaintiff's motion for preliminary injunction [6] is denied.

IT IS SO ORDERED.

Dated this ___15___ day of ___FEB_____, 2013

_____
Marco A. Hernandez
United States District Judge

22 - OPINION & ORDER